(No. 49342.

WILEY EMBERTON, Appellant, v. STATE FARM MU-TUAL AUTOMOBILE INSURANCE COMPANY *et al.*, Appellees.

*Opinion filed January 27, 1978.—Modified on denial of rehearing March 30, 1978.*

DOOLEY, J., specially concurring.

James Walker, Ltd., of Bloomington, for appellant.

Costigan & Wollrab, of Bloomington (William F. Costigan, of counsel), for appellees.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendants, State Farm Mutual Automobile Insurance Company and Ellerbe Associates, Inc., appealed from the judgment of the circuit court of Peoria County entered in favor of plaintiff, Wiley Emberton, on a jury verdict in the amount of $36,500. The appellate court reversed (44 Ill. App. 3d 839), and we allowed plaintiff's petition for leave to appeal. Defendant State Farm is the owner of certain premises in Bloomington, upon which was being constructed its "corporate headquarters" building. Defendant Ellerbe had entered into a contract with defendant State Farm to provide architectural services for the design and construction of the building. Plaintiff was on the premises as an employee of Utley-James, Inc., the general contractor, and, while engaged in the moving of a portable scaffold, suffered injuries. Charging violations of the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, pars. 60-69) plaintiff brought suit against both State Farm and Ellerbe to recover damages for the personal injuries suffered. Relying on *McGovern v. Standish*, 65 Ill. 2d 54, the appellate court held that as a matter of law the defendants were not persons "having charge of" the construction of the building and that the circuit court had

erred in denying defendants' post-trial motion for judgment notwithstanding the verdict.

Section 9 of the Structural Work Act in pertinent part provides:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection [or] construction *** of any building *** within the provisions of this act, shall comply with all the terms thereof ***.
>
> * * *
>
> For any injury to person or property, occasioned by any wilful violations of this act, *** a right of action shall accrue to the party injured, for any direct damages sustained thereby; ***." Ill. Rev. Stat. 1975, ch. 48, par. 69.

This court has several times considered the question of what evidence is required to prove that a person is one "having charge of" work within the contemplation of the Act. In *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 22 Ill. 2d 305, the freight dock on the defendant railroad's premises was being rebuilt. The engineering and architectural plans for the work were prepared by the office of its chief architect, who was also charged with inspecting the work to see that it was constructed according to specifications. Under a contract with the defendant railroad, all of the construction work was being performed by E. H. Marhoefer and Company. The evidence showed that the bricklaying, assembling and construction of scaffolds, and the placement of ladders, were all performed by Marhoefer's employees and under their supervision. There was testimony that the chief architect for the defendant railroad and other personnel made frequent inspections of the construction project, sometimes spending as much as five hours a day on the premises, but it is not clear from the evidence as to how detailed those inspections were. There was no proof that they exercised control over the manner in which the work was being done or that they inspected the scaffolds,

ladders or other appliances. The court held that under the circumstances shown it was a disputed question of fact "whether the owner could be deemed to be in charge of the construction within the meaning of the act, and it would be the province of the jury, under proper instructions, to make that determination." 22 Ill. 2d 305, 323.

In *Larson v. Commonwealth Edison Co.,* 33 Ill. 2d 316, defendant Commonwealth Edison was engaged in remodeling an electric generating plant which consisted of several buildings occupying an area of three city blocks. It entered into 70 to 80 contracts with numerous contractors. The defendant, Sargent & Lundy, a firm of consulting engineers, prepared the contracts, the work plans, structural designs and specifications used in the construction work. Plaintiff Larson's employer (Paschen) had a contract for work in unit 7 of the project.

The contract provided that Paschen was to perform additional work as directed by Edison. Edison issued a "purchase order" to Paschen for the erection of a barricade between two units of the project which required Paschen to furnish certain labor, materials, tools and equipment "as directed by the Station Construction Department, and in accordance with drawings to be issued by Sargent & Lundy." (33 Ill. 2d 316, 319.) While the work authorized by the purchase order was in progress, plaintiff Larson was injured.

Sargent & Lundy had no personnel working at the construction site, but six employees of Edison's station construction department were on the job at all times. They exercised no control over the work "but merely inspected to see that the terms and specifications of the contracts were complied with." (33 Ill. 2d 316, 319.) Their inspection did not extend to the kind or safety of the scaffold, their only interest being to determine whether Edison "got the type of barricade specified." (33 Ill. 2d 316, 319.) In reversing the judgments entered in favor of

both defendants and remanding the cause for a new trial the court said: "While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with 'supervison and control' in varying degrees, it is our opinion the language of the statute, and the legislative intent it reflects, do not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure." (33 Ill. 2d 316, 321-22.) Referring to *Gannon* the court said: "Nothing in Gannon suggests or holds that either the exercise of supervision and control, or the retention of the right to do so, are essential ingredients for having charge. And manifestly, the plain language of the statute does not

limit duty and liability to owners retaining control and supervision of the work ***." 33 Ill. 2d 316, 322.

In *McGovern v. Standish,* 65 Ill. 2d 54, upon which the appellate court relied, the majority held that the defendant architect was not liable under the Structural Work Act because "the evidence does not establish that the defendant had any right to control or direct the manner or methods by which the construction would be accomplished. Moreover, the undisputed testimony at trial was to the effect that the defendant had never attempted to exercise any control over the work by issuing orders or directives to those associated with the construction. Indeed, all of the evidence adduced at trial is consistent with the view that the defendant's function was limited to generally overseeing the work in an effort to ensure that the completed project conformed with the plans and specifications.

"It is true that the contract between the Sisters and Wilson recognized in the defendant a right to supervise the work. But, as a general rule, even the 'duty to "supervise the work" merely creates a duty to see that the building when constructed meets the plans and specifications contracted for.' (*Miller v. DeWitt,* 37 Ill. 2d 273, 284.) The right to inspect the work, also given the defendant, is but ancillary to the defendant's right to supervise. These rights, as afforded the defendant in this case, cannot alone form a basis for a finding of coverage under the Act." (65 Ill. 2d 54, 69.) This holding rests upon a misreading of *Larson.* In *Larson,* discussing an instruction given in the case, the court quoted from *Gannon* to the effect that " 'before civil liability may be imposed upon the defendant owner under section 9 of the act, it must appear that he had charge of the construction operations involving the violation.' " (33 Ill. 2d 316, 323.) It went on, however, to point out that in that case there were some 75 to 80 contracts involving a large number of contractors, that the

alteration work was going on in several buildings and that Edison could be liable "only if the activities by which it could be found to have charge extended to the work of Paschen, the contractor which erected the faulty scaffold." (33 Ill. 2d 316, 323.) It is clear from the opinion that neither the exercise of supervision and control nor the retention of the right to do so "are essential ingredients for having charge" (33 Ill. 2d 316, 322) and that the "direct connection" with the work requisite to the imposition of liability may be proved by evidence of inspections or other activities and may also stem from the right to control the work whether or not that right is exercised. (33 Ill. 2d 316, 324.) The term "direct connection," like the term "having charge of," is one of common usage and understanding, and whether persons may be held to have a "direct connection" with the work depends upon the circumstances of each case. The contracts in *McGovern* (65 Ill. 2d 54, 63-65) provided for supervision by the architect, required the contractor to observe "The safety provisions of applicable laws" (65 Ill. 2d 54, 64) and conferred upon the architect the power to certify to the owner that sufficient cause existed to stop the work or terminate the contract (see paragraph 31, 65 Ill. 2d 54, 64). If the language in the majority opinion in *McGovern* was intended to mean that it may be shown that a person was "in charge of the particular operations which involved the violation from which the alleged injury arose" (65 Ill. 2d 54, 67) either by proof that he exercised control, or that the right to control the work existed, whether exercised or not, it correctly states the law. As construed by the appellate court in this case, the holding is clearly erroneous.

In *Miller v. DeWitt*, 37 Ill. 2d 273, the defendant architects were held liable under the Structural Work Act. The pertinent parts of the contract between the architects and the owner are set forth in the opinion (see 37 Ill. 2d

273, 280). Paragraph 38 of the contract entered into between the owner of the project and the general contractor defined the "architect's status" and provided that "He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract." (37 Ill. 2d 273, 282.) In holding the defendants liable the court said, "We also believe that what we heretofore have said regarding the architects' right to stop the work if it were being done in a dangerous manner makes them persons 'having charge' within the meaning of the act. (*Larson v. Commonwealth Edison Co.* 33 Ill. 2d 316.)" (37 Ill. 2d 273, 286.) What the court had "heretofore" said was that "From a careful examination of the record we conclude that if the architects knew or in the exercise of reasonable care should have known that the shoring was inadequate and unsafe, they had the right and corresponding duty to stop the work until the unsafe condition had been remedied. (*Erhart v. Hummonds,* 232 Ark. 133, 334 S.W.2d 869.)" 37 Ill. 2d 273, 285.

The testimony shows that defendant State Farm maintained a building design and construction department with 24 employees which was responsible for the design and construction of all company-owned buildings throughout the United States and Canada. It did preliminary layout work for the construction of State Farm's corporate headquarters building in Bloomington and worked with defendant Ellerbe "to arrive at the final design and appearance of the building." A contract was entered into with defendant Ellerbe for architectural services and with Utley-James, Inc., as the general contractor. All subcontracts were handled by the general contractor. During the period of construction, inspections were made by various of defendant State Farm's employees, some in company with the representative of the architect. An exhibit, offered and admitted into evidence, shows in excess of 1,300 such inspections. John F. Harris, State Farm's

assistant vice president for building design and construction, went to the construction site approximately twice each week and remained there for periods of time which "varied from an hour to all day." After the execution of the original contract, approximately 127 change orders were issued at the direction of defendant State Farm. At various times it directed the architect to issue a stop work order. A number of major changes were made involving thousands of items and resulting in an increase in the cost of the project of 36.7%.

Joseph Ostrander testified that he was appointed project representative by defendant Ellerbe, that he arrived on the job in August 1970 and remained there until September 1973. He made frequent on-site inspections and attended all of the weekly progress and coordination meetings conducted by the general contractor with the subcontractors. When he became aware of a condition which was not safe he mentioned it to the general contractor's manager. He recalled specifically pointing out an unsafe condition concerning the lack of hand railings on a stair landing. That particular incident was later discussed at a progress meeting. In meetings with representatives of State Farm he had given directions on the methods of installing acoustical tile, had required that a certain electrical ground be installed before slabs were poured, and had approved a proposed method of fabricating floor box girders. The testimony shows that Mr. Harris frequently attended the cordination meetings held by the general contractor with the subcontractors.

Although the contracts between State Farm and the general contractor and State Farm and Ellerbe are not in evidence, defendants, in their brief, state that both contracts were standard AIA (American Institute of Architects) forms. Excerpts from the contract between the defendants were offered and admitted into evidence and contained the following:

"1.1.17 The Architect shall have authority to reject Work which does not conform to the Contract Documents. The Architect shall also have authority to require the Contractor to stop the Work whenever in his reasonable opinion it may be necessary for the proper performance of the Contract. The Architect shall not be liable to the Owner for the consequences of any decision made by him in good faith either to exercise or not to exercise his authority to stop the Work."

We consider first whether the appellate court correctly held that the evidence was insufficient to support the jury's verdict that defendant State Farm was "in charge of" the work within the meaning of the Structural Work Act. We are unable to distinguish the participation of defendant State Farm in the construction of its building from the participation of the defendant railroad in the construction involved in *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.,* 22 Ill. 2d 305. Here, as in *Gannon,* all of the work was being done by a contractor, but employees of the defendant made frequent inspections of the construction activity. In both cases it was testified that the owner had not exercised control over the manner in which the work was being done or concerned itself with the assembling and construction of scaffolds. Here, defendant State Farm's assistant vice president for building design and construction made frequent visits to the construction site, spending periods of time which varied from an hour to an entire day. In *Gannon* the chief architect of the defendant railroad "and other personnel made frequent inspections of the construction project, spending as much as five hours a day on the premises on occasions." (22 Ill. 2d 305, 323.) Here too, as in *Larson v. Commonwealth Edison Co.,* 33 Ill. 2d 316, defendant ordered periodic changes in the work, and there is nothing in the opinion in *Larson* to indicate that the defendant owner retained or exercised the degree of supervision and control shown by the record in this case.

As stated in the language of Illinois Pattern Jury Instruction (IPI) Civil No. 180.02: "*** it is possible for more than one person to 'have charge of' the work. One or more persons can have charge of the overall work, and other persons can have charge of the phase of the work in connection with which an injury occurs." In *Larson* the work involved a large parcel of land, numerous structures, and 75 to 80 separate contracts. There is no indication whether portions of the project, other than the one in which plaintiff Larson was employed, were being performed under contracts entered into directly by Commonwealth Edison or under contracts entered into with someone acting in the capacity of a general contractor. A careful reading of the opinion shows that although the court acknowledged that under *Gannon* "an owner must have some direct connection with the operations, over and above mere ownership or the employment of an independent contractor" (33 Ill. 2d 316, 322), such "direct connection" does not require either the exercise of supervision and control or the retention of the right to do so. On this record we hold that there was sufficient evidence for the jury to find that defendant State Farm was one of the persons "having charge of" the construction and that the appellate court erred in reversing the judgment.

We consider next the question whether there was sufficient evidence from which the jury could find that the defendant architect Ellerbe was "in charge of" the work within the meaning of the Structural Work Act. As previously noted, paragraph 1.1.17 of the contract between these defendants provided: "The Architect shall also have authority to require the Contractor to stop the Work whenever in his reasonable opinion it may be necessary for the proper performance of the Contract." In *Miller v. DeWitt*, 37 Ill. 2d 273, in which the defendant architects were held liable under the Structural Work Act, the

contract provided: "He [the architect] has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract." (37 Ill. 2d 273, 282.) The court construed that language to confer upon the architects the right to stop the work because certain "shoring" was inadequate and held that they were persons "having charge of" the work within the meaning of the Act. Although there are semantical differences between the provisions of the contract in *Miller* and here, we fail to perceive in what manner the powers conferred or the duties imposed upon the defendant Ellerbe differ from those in *Miller*. We hold therefore that the appellate court erred in holding that there was insufficient evidence to sustain the verdict of the jury against the defendant Ellerbe. In view of the conclusion reached it is not necessary to consider plaintiff's contentions concerning allegedly erroneous rulings on the admission of evidence.

Following the entry of judgment in the circuit court, plaintiff's employer, Utley-James, Inc., filed a petition for leave to intervene and requested that an order be entered subrogating it to the extent of payments made to plaintiff under an award for workmen's compensation. The circuit court dismissed the petition and the employer appealed. Because of its reversal of the judgment entered in favor of plaintiff, the appellate court did not consider the matter. (44 Ill. App. 3d 839, 844.) Although contending that Utley-James was not entitled to subrogation, plaintiff concedes that the petition to intervene was erroneously dismissed. The order of dismissal is therefore reversed and the cause is remanded to the circuit court of Peoria County for further proceedings on the petition to intervene.

· For the reasons stated, the judgment of the appellate court is reversed and, except for the order dis-

missing the petition to intervene, the judgment of the circuit court is affirmed.

> *Appellate court reversed; circuit court affirmed in part and reversed in part; cause remanded.*

MR. JUSTICE DOOLEY, specially concurring:

I agree with the judgment of the court and the persuasive opinion of Mr. Justice Goldenhersh.

In my opinion, it would facilitate the work of the *nisi prius* and appellate courts in this State if we overruled *McGovern v. Standish* (1976), 65 Ill. 2d 54, *a nomine*. It is contrary to the language of the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, pars. 60—69), as well as a large body of decisions of this court on the issue as to what constitutes "in charge of." See *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 99-102; *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 525-27; *McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, 151-52; *Buehler v. Toynan Construction Co.* (1972), 52 Ill. 2d 214, 216-17; *Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153, 157-58; *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 286; *Kobus v. Formfit Co.* (1966), 35 Ill. 2d 533, 537-38; *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 321-23; *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 323-24.

It is also inconsistent with the proposition that more than one person may have charge of the work. *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 291; *Li Petri v. Turner Construction Co.* (1967), 36 Ill. 2d 597; *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316. See my specially concurring opinion in *Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399, 413, for a discussion of

*McGovern.*

*McGovern* has already caused multiple problems for appellate courts. Here (*Emberton v. State Farm Mutual Automobile Insurance Co.* (1976), 44 Ill. App. 3d 839) the appellate court reversed a judgment by a divided vote on the basis of *McGovern.* In *Meek v. Spinney, Coady & Parker Architects, Inc.* (1977), 50 Ill. App. 3d 919, the dismissal of a complaint was affirmed as to one defendant on this particular issue, and in *Powers v. National Mirror Works* (1977), 52 Ill. App. 3d 592, a summary judgment was affirmed on this issue, with *McGovern* the key case.

Unless specifically overruled, the courts and the litigants will not know the status of this decision and will continue to be misled by it. In the final analysis, it is the litigant who pays the reckoning.